All right. I'd like for the attorneys to step up to the podium. Tell the court your name, who you represent, and approximately how long your argument will take. Good morning, counsel. Good morning, Judge. Stephen Potts, P-O-T-T-S. I represent John New, Jr. I would say my argument will probably take 20 minutes. Very good. Good morning, counsel. Good morning, Your Honor. Erica Sebern, S-E-Y-B-U-R-N, from the Attorney General's Office, representing the people. I would estimate my argument might take 10 minutes, depending on the court's questions. Very good. All right. Mr. Potts, why don't you proceed with your argument. Thank you. May it please the Court. Good morning, Your Honors. As I stated, my name is Stephen Potts. I represent the respondent, John New, Jr. And we are here today, and I will discuss in detail specifically two issues that are presented in my brief in particular. The first issue I will address specifically will be why the testimony of the paraphilia, not otherwise specified, sexually attracted to adolescent males, hemophilia diagnosis, should not have been admitted at the trial of this case. In addition, Your Honors, I will go into detail and discuss why it was an error to allow John New, Jr. to possibly be committed based on mental disorders that were never pled by the State in any of the pleadings filed in this case. Specifically with regards to the first argument, Your Honors, the State filed a petition in this case seeking commitment of the Sexually Violent Persons Act of Mr. New based on the proposed diagnosis of PNLS, paraphilia not otherwise specified, sexually attracted to adolescent males. Now, as I argued in my brief, this is what is in the field of psychiatry, specifically in the field related to forensic psychiatry in the sexually violent persons context, has been coined a hemophilia diagnosis. Now, I know the State takes issue with that, but during the deposition, which is in the record, that I put in the record with regards to the deposition testimony of one of the State doctors, it specifically was conceded, and I believe if you read the record, there's also some concessions with regards to my cross-examination, that this hemophilia diagnosis is what we're talking about here. And what hemophilia is, it was a diagnosis that was essentially coined for use in these types of proceedings. And in fact, with regards to the Fry issue in this case, with regards to the newer novelness of this diagnosis, this diagnosis was actually first proposed for use and first came into knowledge in the psychiatric community in about 2005, which is at the same time that this case was filed for the detention of Mr. New herein. Specifically, it's our position that this diagnosis is newer novel and that it's not generally accepted in the general scientific community. One of the things that you'll notice in the briefs that were filed in this case is that I cited to extensive law review articles and psychiatric articles and case law with regards to this issue of whether hemophilia is in fact generally accepted in the psychiatric community. And it's not. It's not even accepted, remotely accepted. If you look at the cases, they talk... Would you say, I mean, what happened here, taking your argument, is that the judge should have held a Fry hearing? I mean, there was no hearing on the issue you're presenting. Right. Right? So it would have been appropriate to have had at least a hearing to make that determination. What the judge said is simply rejected what you're saying and went ahead with the trial without having a hearing. Yes, Judge. So basically what you're asking for is that it should be reversed so that an appropriate thing to do in a civil case where this new and novel approach is being used, wouldn't it have been a hearing on the Fry issue? At the very least, Judge, yes, at the very least, he should have considered all these things, especially in light of the fact of all the material which I submitted in support of my motion to eliminate and the complete dearth of material that was submitted by the state. The state didn't submit anything with regards to the support of the hemophilia diagnosis. They submitted, well, their argument was essentially paraphilia not otherwise specified is in the DSM-IV and it's used in these type of proceedings. So you should allow this to be used because it's generally accepted. They didn't talk about the fact that the specifier hemophilia attracted to adolescent males is really what the issue is here. The paraphilia not otherwise specified is just a catch-all category that as I put in my brief and as I cited, I think Alan Francis, who's a general expert on this area of the DSM-IV and the paraphilias in particular, calls it a wastebasket, a trashcan diagnosis. It's just a general diagnosis that's really not even appropriate necessarily for a forensic setting. I know that these cases weren't cited in your briefs, but I think there's been several cases on this issue since your briefs have been filed, particularly in federal courts around the country. Well, I did file in my reply. I did file that the Adam Walsh Act, which is all those cases are being held in North Carolina. A lot of them, yes. Well, it was my understanding that that's the court that's doing all the Adam Walsh cases and they're dealing with this on a regular basis. And I think I cited three cases in my reply where the district court in those cases specifically said, I can't commit somebody based on a proposed diagnosis like this because it's not even really a diagnosis. There's also been another development which has happened since I filed my briefs, which is the DSM-V is going to be out in May. And it's not going to contain this diagnosis, which is the pedihemophilia diagnosis, which is supposed to be the same as what we're talking about here. Pedihemophilia was a proposed diagnosis, which is what we're talking about here, which is hemophilia. That was proposed for the DSM-V. DSM-V is going to be out in May. It's not going to have that in there. And that was actually debated as to whether or not it should be. Is that relevant to our decision here, whether it's in there or not? Well, I think it's relevant to the determination of whether or not this court should at the very least remand for a FRI hearing to determine whether there's general acceptance in the psychiatric community here. I don't think that there's anything that the government has cited in any of their briefs, either at trial or to the trial court judge in oral argument or to this court, that shows that they've actually got a psychiatrist or a psychologist who's published any article, a blog, a peer-reviewed article, that says this is a legitimate diagnosis. There's nothing that they cited, which at the very least, if they're going to say that it passes the FRI test, the flying colors, shoot. Hasn't Dr. Blanchard done that, though? But Blanchard is something that I cited as pointing out that that's how it was developed. Blanchard's been rejected by all these other... But there is somebody who's gone on the other side. I mean, everybody's attacking Blanchard. He was the guy who was kind of up front on it. I agree. There is somebody on the other side, but it's a lone wolf that he's in the woods out there. There's nobody else. They didn't cite any cases that say this is acceptable at all. They didn't say anything about why, as a matter of law, that the trial court... Because that's what happened. Blanchard, he said, I've heard these arguments before about paraphilia not otherwise specified. It's in there. I'm going to allow it to come into evidence. Now, what he's talking about, really, is he hears this all the time with regards to what's called paraphilia not otherwise specified non-consent, which is used a lot in these types of proceedings. This case is not that. This case is ahebophilia, adolescent males. I've been doing these cases for a while. I've never seen it in one of these cases that I've had this diagnosis before. It's the first time this has been presented as an issue with regards to any of these cases that I've handled. Counsel, do you have a problem with the test that Drs. Fogel and Brooker used to arrive at the diagnosis? I have a problem with the method that they used to come to the diagnosis, because I think that if you look at my brief, and I asked specific questions on cross-examination with regards to Dr. Fogel about how do you come up with this diagnosis with regards to what you say the specific criteria are? How do you apply this, and what are the standards that you use? He couldn't even answer those questions, especially when it came to the issue of how do you define an adolescent male? How do you define an adolescent? He really couldn't give me an answer. 11 to 14 is what he came up with from somewhere. But then at the same time, he said, well, it could be a different age. It could be 13 or above, or 14 or 15. And then he also said, I think one of the things he said was, he had never even determined whether or not any of the alleged victims in the criminal cases, or any of the people that they had, they alleged that he had an inappropriate contact with somebody in the Department of Corrections that was indicative of this diagnosis, and that that person looked young. He had no idea what that person looked like. This was a 6 foot 4 inch male in the Department of Corrections that was obviously an adult, yet he used that specific set of facts as confirmation of this diagnosis. And I know what you're getting at, Judge. I know you're getting at the argument that they're making. I think you're getting at the argument that they're making, that because this is a psychiatric diagnosis, that the Frye analysis doesn't apply. That's just not the law. We apply Frye analysis all the time to when there's a psychiatric diagnosis. This alienation of affection, it's my understanding, is a current in vogue diagnosis in the field of divorce and domestic relations. That there is contentions, that there are syndromes that have been inflicted on children as a result of an alienation and affection. They apply Frye analysis in those types of cases. They apply the Frye analysis in the situation where you have battered wife syndrome, which is used in defense in a case. But in the Frye analysis, don't you challenge the methodology as opposed to the opinions or conclusions of the expert? Well, I think that the methodology that I'm challenging here is the methodology which is used to come to the conclusion that this is actually a legitimate diagnosis. And that's what we're talking about here. It's the methodology of how this is diagnosed at all. Because in order for it to have been diagnosable, there has to be some kind of standards. There has to be some kind of consensus. There's got to be some kind of application of a process that is objective to make a forensic diagnosis like this when you're talking about indefinite commitment. That's what we're talking about here. We're talking about indefinite commitment predicated on a diagnosis that is at the very least marginal. In fact, I would go so far as to say the only thing that's generally accepted about this diagnosis is that it's not a diagnosis. That's my position. If you look at all the cases and you look at all the studies, other than the Blanchard study. What methodology is being questioned? The methodology that's being questioned is the process of determining that this is an actual diagnosis and to get into that conclusion. What do you talk about process? What are you referring to? I mean process, methodology. I'm talking about how this doctor determined that based on these similar, that these factors, he can come to the conclusion. Or any facts specifically, he can come to the conclusion that this is a diagnosable condition. And that this is something that he can testify as a forensic psychologist is an actual diagnosis at all. And that's not what we have here. We don't have anything that's even, it's, if you look at my brief specifically, I address the issue of whether or not there's even any protocols that are used to determine whether or not this is even a diagnosis and how you would apply those. And I went into detail, probably a little too much detail in my brief, but detail about how these things, what they say they're applied, how they're applied, but how they're really not. There's really no standards and there's really no agreement as to how any of this stuff is supposed to be done  It seems to me that in broad strokes what your point on appeal is, is that in a civil setting when the proponent of an opinion through an expert, proponent of an expert is proffering a position that is not generally accepted in that field of expertise. And it's demonstrated to the court, maybe on a prima facie basis, that judge, this opinion is not generally accepted in this field and here is my basis for saying it. And the other side doesn't counteract that prima facie presentation to the court, that the court is obligated to hold the FRI hearing to determine whether the evidence is sufficient to allow it to be presented to the trifecta for their determination as to which expert should prevail. You know, what weight to give to the various experts because if the judge at the FRI hearing is not convinced, or is not persuaded, better term, that the proffered opinion is not generally accepted and this is something within the area of the expertise of the experts, that the judge has the obligation then to say no we're not even going to let the fact finder hear this. Because in this case it seems to me that your argument is I presented to the trial court a basis to question whether these experts had an appropriate opinion based upon psychiatric principles. And the jury should not be put in that position of hearing this unacceptable, generally not accepted criteria, principles, opinions. It's not right. It doesn't provide a fair opportunity to present the case. Now, you add to that, that yes it's a civil proceeding, but the burden of proof is proof beyond a reasonable doubt. It makes a FRI determination more critical than in a civil suit where you're talking about products liability, child custody, other important matters, but not that have an element of proof beyond a reasonable doubt. That seems to me where you're going with this. You said it better than I certainly have been arguing today. That's exactly my position. And it comes down to what you're talking about too. We're talking about liberty interests here. We're not talking about an absolute liberty interest with regards to the fundamental freedoms that we have. And because the state is actually a proponent of the evidence, they've got the burden to prove that it's admissible to the state. I don't have to prove to the court that it's not admissible. They're the ones that have the burden to prove that it's admissible because they're the proponent. And that's exactly what should have happened. At the very least, the judge should have said, hold on a second. I want to hear from a doctor from the state that's going to tell me why I should allow the jury. Because once the jury hears it, it's got the imprimatur of the psychiatric person. But there's a difference between the conclusions or opinion and the methodology. And the Frye cases distinguish those two. Okay. You agree with that? I agree with that. But I think that if you look at the other psychiatric cases that deal with Frye hearings, it's clear that a Frye hearing is appropriate on a diagnosis, contrary to what the state's arguing. What's your best case? There's an NRAE-KT is the case. And there's also a ‑‑ I can't remember. I'm sorry, Judge. It's in my brief. It's specifically with regards to the issue of battered wife syndrome and whether the battered wife syndrome was a valid defense in a criminal case. Okay. But when you read the testimony of Rutherspoon and the two state psychiatrists, their methodology, it seemed to me, was pretty similar. They gave similar tests. They considered similar interviews. You know, they each had their own interview but asked similar type questions. I mean, there was a lot of similarity there. It's just they reached different opinions. So, I mean, I'm trying to figure out ‑‑ I'm not sure that that's the methodology you have to look at. Okay. How this diagnosis actually came into being. How it was concluded either by the doctor that this was even a diagnosis that he could make based on what he relied on. Not what his tests he did. Not what interviews he did. But in the psychiatric community, they've got to come to some kind of ‑‑ there's got to be some kind of ideas out there. People have ideas about this could possibly be a new diagnosis. And here's why I think this could be a new diagnosis. So it's not about Dr. Fogel or Dr. Brucker's methods. But in doing the evaluation, it's about what they did and how they applied this concept of hemophilia to the methods that they employed. But didn't Rutherspoon use similar methodology but came to an exact opposite conclusion? Well, he came to a ‑‑ yes, he came to a different conclusion. But he used the important question, in my opinion, is the methodologies. Again, tell me how the method ‑‑ you're talking about diagnoses. But I thought Frey talks about methodologies. I think the methodology that I'm talking about is somebody like Blanchard or somebody in the psychiatric community does research. And they peer review articles. And they publish articles. And they explain to the psychiatric community, here's how we believe this is a psychiatric condition. And here's how these things are that you should apply to determine that this psychiatric condition exists. So it's not necessarily Brucker and Fogel's methods. It's the methods that were used to develop the actual proposed diagnoses. That's what had to be looked at. And that's what we have. We have a new diagnoses based on ideas and methods of Blanchard in particular. I know that I'm running out of time. If you don't have any other questions, I'm going to move on to my second argument. With regards to my second argument, in this case, the state pled that John New Jr. was committable based on paraphilia, based on the hemophilia diagnosis. The state wants to argue that I waived this argument in the lower court with regards to whether or not he could be committed on any other diagnoses. I objected numerous times during the course of the case that there couldn't be commitment based on either antisocial personality disorder or polysubstance abuse. The cases and the statute are absolutely clear that this is supposed to be treated like a civil case and that the rules of civil procedure apply, unless there's something in the statute that accepts something in the statute to those rules. Specifically, in this case, the state didn't move to amend their pleadings. They didn't... So let's assume you're correct, that there's a variance between what they proved and what they pled. Okay, that's your argument. Right. And, I mean, the judge even acknowledged it at your motion to eliminate. The question then becomes, was there prejudice? And so I'd like you to focus on the prejudice. Where have you shown that there would be prejudice by this variance? Well, I can tell you what I think the prejudice is without necessarily being able to point to facts that the jury did. But when you have a case like this and you have the testimony that was gone into, you've got Dr. I think it was Brucker that had all these different diagnoses. He's got all these different diagnoses, one of them being hemophilia, but the rest being antisocial personality and essentially substance abuse disorders. When the jury hears all that evidence and they hear testimony with regards to these disorders, the jury can come to the conclusion during deliberations, which was my fear and which I brought to the court's attention repeatedly, is that they could conclude, even if the jury concludes that paraphernalia not otherwise specified isn't a diagnosis that they find. Because for whatever reason, maybe they didn't buy it was a diagnosis because of the cross-examination. Maybe they just didn't think that he had the factors, or maybe they just didn't agree with it. That they could find him committable based on either antisocial personality disorder alone or polysubstance abuse disorder alone. That's the prejudice, is that if the state thought that he was supposed to be committable based on these diagnoses, it would have been extremely easy for them to say how, either plead it in the alternative, he's committable, count one, he's committable based on hemophilia, count two, he's committable based on antisocial personality disorder. I don't think they would have pled that he's committable based on polysubstance disorder. We're talking about prejudice. Didn't you rebut the testimony of the state diagnosis with regard to substance abuse and also with the antisocial personality disorder diagnosis? Didn't you ask questions about that and have an opportunity to cross on those issues? Certainly, Judge. Okay, so again, I guess going back to the prejudice issue, if there's prejudice, I think you're right. Well, it's hard for me to get into the brain of the juries, but I know that the jury, if the jury hears about all these disorders and they're not told specifically which ones that they can make a finding on are the bases for the finding, then they're going to, he's got something. He's a drug addict or an alcoholic. That sounds like it's enough for a mental disorder. Are you saying the instructions were incorrect? I mean, then the instructions were just on the note. Well, I asked. As part of my argument in this, I asked specifically that they be instructed that they could only find him committable based on the PNOS diagnosis. Right, and he wouldn't do that. No. But the instructions did say that was what they were supposed to decide on. It just didn't say that's the only thing. Well, it said mental disorder. Right. Which is the statute. And mental disorder is defined under the jury instructions as a congenital or acquired condition that affects the volitional capacity of the individuals. And it's specifically defined. But the way that the testimony came in by the state, they could find that polysubstance abuse disorder is a mental disorder under the statute, even though there's no way that a legitimate, I mean, in my opinion, there's no way that a court could find that a person is committable as an SVP based on polysubstance disorder alone. Can't form the basis for commitment under the statute, in my opinion. I don't even think the doctors would take that position, quite frankly, Judge. Counsel, if the state had amended their complaint, would you have changed the way you defended Mr. Newton? I think I would have, Judge. How? Well, I think that, first of all, I think I would have, if they had amended their complaint, I think that would have been a tacit acknowledgment that they couldn't have, that they couldn't see commitment based on possibly the polysubstance disorder. I don't think they would. I think they would have amended it to be polysubstance disorder and antisocial personality disorder. But your cross-examination wouldn't have been any different, would it? I think it might have been a little more vigorous with regards to the issue of antisocial personality disorder and asking some more hypothetical questions about whether antisocial personality disorder and whether the polysubstance disorder alone would have been sufficient. Yeah, I do. But you did get an opportunity to cross-examine on those issues, correct? I certainly did, Judge. I got an opportunity. But I think that it's a clear case, though, of I don't think that those cases that I'm talking about, I don't think that those cases that I cited necessarily say that you didn't get the opportunity to examine the witnesses on a potential theory. I think those cases say that if you're going to plead a cause of action and then you're going to ask the jury to find a verdict based on a different set of facts than you pled, that's just not right. But you weren't surprised. No. Well, actually, I was surprised that they would take the position that they wouldn't amend the polysubstance disorder. Right, but not by what happened at the trial. I mean, you were prepared for it because you cross-examined it and you knew the possibility because you raised it because it had been raised earlier and you knew there was a possibility of being raised. Right. So it was no surprise to you that that came in. I think that I was a little surprised that they made, that they did, you know, to me there were points in the trial where there was testimony where it seemed to be saying that polysubstance abuse disorder was maybe a little bit more of a contributing factor to this actual finding of SVP by the doctors than that was prepared for necessarily at the beginning because I just don't think that there's any basis in that. And one of the problems is that because there's no limiting instruction and because there's no ratings on what the state can do during their examination or during their cross, you get this amorphous testimony and these amorphous arguments by the state that, well, these are all blended and it's all part of a continuum of he's got polysubstance disorder that contributes to his offending. But what is the actual thing that you're trying to commit him on that compels him to engage in this behavior? That's what the jury's got to decide, a specific diagnosis, not some amorphous concept of everything together. If the court doesn't have any other questions, I think I'm way out of time. Very good, Mr. Potts. Thank you. Thank you. Good morning again, Ms. Seifert. Good morning again, Your Honors. May it please the court. This court should affirm the judgment of the trial court. None of Respondent's claims are meritorious. And since he began with the Frye issue, I'll begin there as well. I think the court's questions have sussed out the major threshold problem with Respondent's position, which is that he's attacking the conclusion that two experts came to rather than the methodology that they used to come to that conclusion. And as Your Honor noted, the methodology used by these psychologists and psychiatrists was exactly the same methodology that Respondent's expert used. It's exactly the same methodology. It's the methodology that any psychiatric expert would use. They interviewed Mr. Neumolzer. But his argument is that we're really talking about that methodology versus diagnosis. Yes, he is. And it's our position that extending Frye in the manner that he would like would be an unwarranted extension of Frye. He's essentially trying to expand Frye away from the ways that you generate data to the conclusions that you have come to from that data. And we believe that's an unwarranted extension of Frye. It's also not necessary to protect Respondent's rights in this sort of proceeding. The best way to suss out a disagreement between expert witnesses, who have all examined the same data, they all examined Mr. Neum, they all looked at his history, they looked at exactly the same records, everyone had the same basis of information, they interpreted it differently and came to different conclusions. The best way to suss out the disagreement between those experts is exactly the way that it happened in this court. The trial court handled this issue in precisely the correct way. And if you read, he specifically said, I'm not going to have a Frye hearing, I'm going to let you bring out this controversy through cross-examination. Put to a lay jury who has no basis to evaluate this field of expertise. Shouldn't that be the judge's? The term is really used in Daubert, the gatekeeper. But really, shouldn't that be the function of the court to decide admissibility in the first instance, rather than allowing a jury to hear it and let them weigh the evidence that may not have been admissible in the first instance? May not. Well, Your Honor, I think that we're drawing the distinction between what's admissible and what goes to weight here. Now, obviously, the trial court does have a gatekeeper function. And in a proper Frye context, it is the trial court's function to serve as the gatekeeper to prevent a new or novel methodology that has not been generally accepted from going before the jury. Do you disagree that diagnosis falls within Frye? We do disagree with that. The diagnosis is the conclusion that the experts have drawn. No one's really questioning the methods that any experts used to come to that diagnosis. Neither Dr. Brucker nor Dr. Fogel invented paraphilia NOS. But there was more to it than paraphilia NOS. Yes, they were being specific in that Mr. New seems to have a very specific type. That arguably, according to the respondent, is not generally accepted in the psychiatric field. And therein lies his issue. Yes. But I believe his issue is, again, it's better sussed out by the way that the trial court dealt with this. Without a hearing? Yes. You allow a respondent to present his own expert, which happened here. Dr. Witherspoon got up and testified. He talked at length about whether he thought this was a legitimate diagnosis, and he did not. You allow extensive cross-examination, which happened in this case. I would direct the court to page D129 of Respondent's Counsel's cross-examination of Dr. Fogel. They went through this whole position at length. So your position is that if an expert takes a position, A, whatever the position, and the opponent presents an expert or multiple experts to say that that position of the petitioner's expert is not generally accepted, you can find no one in the entire community that accepts that position, okay? Let's assume that hypothetically, that he is the only one that takes this position. No one else in the field takes this position. No one. That that is allowed to go to a jury and let the jury decide between that testimony and the proponent's testimony, and they can come out and say, We accept the proponent's testimony, and that's good evidence? Your Honors, I would say that juries are often called upon to deal with these controversial factual issues. We don't have FRI hearings every time two scientific experts disagree about something. If their opinion is generally accepted within the community. If the methodology is generally accepted. Well, I commend to your attention the case of Bernadone versus the Industrial Commission, 362 Illinois Appellate 3rd, 582, that specifically deals with whether a FRI hearing is appropriate and used for a diagnosis. And it is. In the civil area, it is used for diagnosis. Your Honor, there are other cases where appellate courts have come out to an opposite conclusion. On paraphernalia, NOS, attracted to adolescent males? Yeah. We cited to a number of cases in our brief, some of which are specific to paraphernalia NOS. Add-on attracted to adolescent males. Because that's the important aspect, right? Your Honor, I haven't read every single SVP case out there. I'm sorry. I can't. And I certainly can't address the case that you just cited to me because I have not read it. All right. That's fair enough. But it's our position that both language of FRI and the precedent of the Illinois Supreme Court tries to draw a distinction between the methods that an expert uses to come to a conclusion and the conclusion itself. For example, in People v. Donaldson, the Illinois Supreme Court went so far as to say that if the method itself is reliable, it doesn't matter if the conclusion that they come to is novel. And again, here, the way that this is sussed out is by presenting the evidence and allowing the jury to weigh it. In Your Honor's earlier hypothetical, if you had one expert on one side and 100 experts on the other side, that's the normal clash of evidence. No, I'm saying two experts, one on each side, and the opponent says no one in the field takes this position. Yes. Ultimately, that is a jury question. I agree that the trial court holds gatekeeper function in terms of dealing with newer novel methods. However, this falls more into the category of being a conclusion that he's attempting to question. It's an expansion of FRI. And the best way to deal with disagreements between experts is to bring forth all the evidence and let the jury decide who is more credible. Juries decide between expert witnesses, in many cases, both criminal and civil. We don't hold FRI hearings and force the trial court to have this gatekeeper function each time experts disagree. FRI isn't meant to reach scientific certainty so that we, you know, can only have one scientific opinion that ends up going before the jury. It's just there to make sure that newer novel methods don't go before the jury if they're not generally accepted. You have here a newer novel diagnosis because there's, you would have conceded that there's debate with regard to whether this disorder exists. There is debate, and that was brought out at trial before the jury. So you have that debate, and you're asking the jury to find that Mr. New has a particular disorder which the medical community doesn't, hasn't even, can't agree on. And it's a relatively new diagnosis, and it's still being debated. Shouldn't the court take a step back and look at the diagnosis? Because could this be a situation where the jury could find that the world is flat just because, you know, they all look at the same evidence, and everybody said, oh, the world's round, but one person said the world's flat. We could be just ignoring the scientific evidence and what's going on in the field. Shouldn't the court be at least aware of that and look at the diagnosis and have a hearing on whether that's appropriate for the jury to consider? It's our position that that's not what Frye is for, for a diagnosis. Now, it would be our position that if Mr. New wanted to bring in 100 experts to testify for him that this is not a valid diagnosis and that Dr. Brooker and Dr. Fogel were talking completely out of left field, that would have been his right. Of course, if he brought in 100 experts, I think that would have accumulated. Right. Wouldn't that be appropriate for a Frye hearing? No, Your Honor. It's our position that a Frye hearing is not for diagnosis. It's for methods. And nobody's questioning the methods here. All three of these experts used exactly the same methods. They just came to different conclusions. Experts often do this. If we had a civil case about a car accident, we could have experts who disagreed about whether the brakes failed because of a manufacturing defect or because somebody actually cut the lines. We don't have a Frye hearing about that. We present all the evidence. We let the jury decide. Juries sometimes have to decide these very difficult questions. We put our trust in them. How would you distinguish diagnosis from methodology? In this case, the diagnosis is paraphilia NOS specifically is attracted to adolescent males. The methodology that they used to reach that is the same methodology that any psychiatrist would use. They sit down and interview Mr. New multiple times. They look at all of his records. They look at all of his history. They come to a diagnosis. It's the same way that any psychiatrist would diagnose anyone with anything. And Mr. New is essentially the same set of data for Dr. Broeker and Dr. Fogle as he is for Dr. Witherspoon or he would be for any other expert. Three different people interviewed Mr. New and reviewed him. Dr. Witherspoon came to different conclusions than the state experts did. That's not a fry hearing. That's a clash of evidence. But isn't a diagnosis, though, it's not the conclusion. Diagnosis is the review of whatever it is that you reviewed to come to. So you go to a doctor and she begins to ask questions. If this or that, look, different tests. You do all these things. So there can be a difference of opinion in how you would diagnose a particular illness. Isn't there a difference between the illness itself and the diagnosis? The illness itself is a conclusion. The diagnosis is the methodology that gets the conclusion. So if you say, I think you're equating the diagnosis with the conclusion. And to me, in medicine, they're absolutely separate because several people can have a different diagnosis. They can look at the same facts and diagnose and come to a different conclusion. But there may be a way if you look at certain things, there may not be an agreement on how the methodology for this particular illness should be pursued. Well, Your Honor, I think that's sort of mushing the things together. I mean, the diagnosis could be cancer. The methodology that you use to reach that is we're going to take x-rays or an MRI and, oh, that looks like a tumor to me. That's the methodology. The diagnosis is the conclusion that it's cancer. Now, in this case, you could say that the diagnosis that they're reaching is the conclusion. They're concluding that he has paraphilia NOS. The jury is then going to make a further conclusion from that and say, and we are finding that this is an element of you being a sexually violent person. So a diagnosis may be an intermediate conclusion, but it is a conclusion nonetheless. Perhaps I'm not answering Your Honor's question. Well, you're saying that you're equating the diagnosis with the conclusion. Yes, the diagnosis is the conclusion that they are reaching. I was trying to see whether it was part of the methodology. Yes, and just as an oncologist is going to look at an MRI or an x-ray, Dr. Broecker and Dr. Fogel and Dr. Witherspoon were looking at Mr. New and talking to him and asking him questions and reviewing all of his records and looking at his prison disciplinary records and listening to everything that he told them about the boys that he fantasized about, even when he was in prison and how he consistently overestimated the ages of the boys that he had sexually assaulted and came to conclusions. Now, they were different conclusions from Dr. Witherspoon. That controversy was brought before the jury. The jury had ample opportunity, based on counsel's cross-examination and the presentation of adverse evidence, to determine whether or not they believed the state's experts versus respondents' experts. I think in your example, if there was a civil trial and it was malpractice and two oncologists testified. One oncologist said, I looked at an x-ray and saw breast cancer. And another oncologist, pre-trial, was presented to the court, and the court was presented with overwhelming data that says no oncologist can look at an x-ray and determine or opine that it's breast cancer. In oncology, we do not use x-rays to diagnose cancer. I think in a civil malpractice case, a FRI hearing would have been held to decide whether a jury should listen to an expert say, I determined cancer from an x-ray, when the field of oncology says, we don't accept that. I think in a civil trial, the trial judge would be obligated to have a FRI hearing to decide whether that's just a matter of opinion or that's something that the field of oncology just does not accept. So I'm not going to let the jury get confused or determine this because it's not generally accepted. Respectfully, Your Honor, I disagree with that conclusion. And I think that in that case, what would happen was you would have one oncologist get up and testify, I saw the cancer on the x-ray, and then the other side would present another oncologist who says, that guy is completely wrong. And then it would be up to the jury to decide, as juries often have to do when it comes to weighing the testimony of experts. If FRI hearings were meant to come to a definitive conclusion about what expert opinions were proper and what were not. That's where the confusion comes in. FRI is just to determine whether this novel principle, and it does include principles, not only methodology, but principles, if this novel principle has general acceptance within the area of expertise that we're dealing with. And that's the issue here that did Judge McHale, when presented with, I'll call it a prima facie case, presented with a good argument that this principle is not generally accepted within the psychiatric or psychological communities. Judge, you should look at this to decide whether it is or it isn't. And then decide whether the jury should hear it or not. Just have a hearing. What was the harm in having a hearing? I suppose the harm in having the hearing would be spending time on a FRI hearing when it wasn't legally required. I'm sorry, Your Honor, I can see my argument is not convincing you, but I'm not sure there's anything else I can say that would. No, I'm interested in being convinced. That's the question. I don't get why a hearing would be inappropriate. It's not legally required and it would take a great deal of time is the first thing that comes to mind as to why you would have an unnecessary FRI hearing. These are already lengthy pretrial proceedings. And if a FRI hearing is not legally required, then it would be appropriate for the trial judge to say, I'm not going to have a FRI hearing. There's a controversy here. We're going to let that clash happen. And my final point is the FRI hearing would simply be that if this court were to determine that this type of diagnosis is subject to a FRI hearing, the appropriate thing would be agreement to the trial court. You can't really have a FRI hearing in the appellate court. It just won't work. I'd like to briefly touch on the issue of the jury instruction as to what the basis of the verdict is. The basis of what, I'm sorry? I'm sorry, Mr. Potts' argument about the basis of the SVP verdict, whether the antisocial personality disorder needed to be pled. In the trial court, this was raised as a jury instruction issue, and it's our position that any other type of argument stemming from this set of facts would be barred by plain error. However, certainly it's not an abuse of discretion for the trial court to issue a set of jury instructions that are directly based on the statute. The jury instructions were themselves proper. They listed the statutory elements. As to anything else, this certainly is not an issue that Mr. New was somehow taken by surprise by what the state's experts testified to as to his other diagnoses. All the reports and depositions were in the record, and it's clear from the record in the cross-examination that Mr. New knew about these other diagnoses, and Mr. Potts was certainly ready to do cross-examination on them. It came up during the cross-examination beginning, I believe, page D138, where they did this cross-examination on the antisocial personality disorder. The state is required to plead in the petition the elements. They're not required to plead every single piece of evidence that is eventually going to come out at trial that might go to support one of the prongs. And here the state's experts were clear that the antisocial personality disorder does help to prove that Mr. New is substantially likely to commit future acts of sexual violence. The antisocial personality disorder shows that he's either unable or unwilling to conform his behavior to societal standards. He reoffends over and over again, and that is certainly relevant to whether he's substantially likely to reoffend. But I thought Mr. Potts wanted instructions so that the jury would understand what the purpose of that testimony was, so that they wouldn't confuse it with the standard that's supposed to under the statute. Well, that does seem to be his argument, but the jury instructions were proper. The jury instructions don't require that the state plead each particular piece of evidence in a particular slot. He asked, I believe he asked Dr. Fogel at length about whether or not antisocial personality disorder would qualify on its own, and Dr. Fogel said, well, no, we're basing this on the paraphilia. So there's really no evidence that the jury somehow improperly used this evidence. There was argument that the antisocial personality disorder was a contributing factor to the fact that he was an SVP, and that's in the state's closing argument. And certainly that was proper. There was no notice problem here. No prejudice accrued. He was able to cross-examine and bring this out and make the arguments to the jury. There really was no error here. Unless the Court has any other questions, we would ask the Court to affirm the judgment of the trial court. Thank you. Thank you, Ms. Segal. Mr. Potts, some brief rebuttal. Yes, thank you. I know I went over. I apologize. Well, just take your time. I just wanted to touch on a couple main points. With regards to counsel's argument, specifically as far as the gatekeeping function, the gatekeeping function is the court's responsibility to prevent evidence that's not admissible or not actually probative to go to a jury to make a jury determination on it. I applaud counsel's trust in the jury process and how the jury comes to make a decision, but when a jury gets presented a testimony by two different experts, that this is a diagnosis that I made and that you should rely on. And not only that, but the experts always testify in these cases that this is a mental disorder under the statute. They testified the ultimate conclusion. So they testified and tell the jury that this is a mental disorder under the statute. So counsel says, well, I could bring in 100 experts to say that it's not a mental disorder. Well, the problem is that I can't because the statute only allowed the respondent to have one expert anyway. And we're not entitled to more than one expert in these proceedings. And it's always typically two experts for the state and one expert for the respondent anyway. So that even compounds the error more than would normally be the case. What happens, what we have here is we have a situation where the function of the trial court has to be, as Justice Pierce said, whether or not we're going to allow the jury to hear the testimony at all before we're going to let them go in the back and decide whether somebody's going to be committed indefinitely in a treatment facility known as a sexually violent person's case. We've got to decide whether or not this is the kind of thing that we can allow to happen, whether or not it's even admissible at all. Do you think there's a difference between a diagnosis and methodology? Well, I've been very unartful in my argument about what the difference is, but I think that I would concur with what you said earlier in that the diagnosis is the methodology which comes to the conclusion as to what the issue is or what the conclusion is is based on the diagnosis. And how they reach that diagnosis is based on the process that they undergo to come to that conclusion. Specifically, though, I think that it's telling because if you look at the state's argument, their argument is essentially that if there is an established field of science, be it medicine, psychiatry, or any other established field, if that established field exists, that any conclusion in that established field is outside the purview of the judge's determination as to whether or not it's subject to FRI. That's not the law in Illinois. It's just not. We don't allow doctors to come in in personal injury cases and testify that somebody has a specific syndrome as the result of specific types of environmental exposures without doing an examination to determine whether or not there's a base function as to whether or not that kind of testimony can come in. And the law is that we have to make that determination and the trial court judges have to make that determination because once it's in the jury's hands, we don't know what the jury's going to conclude. But when you have psychiatric testimony that, quite frankly, in these kinds of proceedings, we're not just talking about the diagnoses. We're talking about the actuarial instruments that come into play. This is pretty confusing stuff. I don't even understand some of this stuff, quite frankly. And if I don't understand all this stuff, how can we expect a jury, based on the state's argument, to be the one that's the gatekeeper as to whether or not this guy should be committed based on these diagnoses without at least having a filter, a SIF, to figure out whether or not they should hear it. If you have other questions, that would be the end of my argument. I would request that this court reverse the judgment of the trial court and remand with instructions. Thank you. Mr. Potts, Ms. Sabourn, I want to compliment you on your arguments and on your briefs. This matter will be taken under advisement, and this court stands in recess.